IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BILLY RAY TRATREE, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-0954 |
| | § | |
| BP PIPELINES (NORTH AMERICA) INC., | § | |
| Defendant. | § | |

---

**BP PIPELINES (NORTH AMERICA) INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFF'S DAMAGES**

---

Monica F. Oathout (SBN 07088320)
David E. Finck (SBN 00793726)
Kanaan L. Wilhite (SBN 24060830)
Schwartz, Junell, Greenberg & Oathout, L.L.P.
909 Fannin Street, Suite 2700
Houston, Texas 77010
Tel: (713) 752-0017
Fax: (713) 752-0327

**Attorneys for Defendant,
BP Pipelines (North America) Inc.**

OF COUNSEL:
Neil L. Brilliant
BP Legal
BP America Inc.
4101 Winfield Road
Mail Code 4 West
Warrenville IL 60555
Tel:  (630) 821-2310
Fax:  (630) 821-3402

### TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    SUMMARY JUDGMENT EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.    Summary Judgment Standard of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.    Failure to Accept Offer of Reinstatement Standard of Proof . . . . . . . . . . . . . . . . . . . 6

C.    Elimination of Claimant's Position Standard of Proof . . . . . . . . . . . . . . . . . . . . . . . . 6

V.    ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A.    Tratree Has Suffered No Damages Since September 27, 2001, When He Refused
BP's Unconditional Offer of Continuing Employment . . . . . . . . . . . . . . . . . . . . . . . 7

       i.    BP's offer of continued employment was substantially similar to his
former position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      ii.   Tratree ignored several provisions of the Collective Bargaining Agreement
that were designed to effectively and efficiently provide for a substantially
similar employment position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.    Tratree Has Suffered No Damages Since May 2005, When BP Fully Divested the
Pipeline that Tratree Worked On, Eliminating All Positions . . . . . . . . . . . . . . . . . . . 13

       i.    BP's determination to eliminate Tratree was the result of sound business
judgment to ultimately divest the pipeline Tratree worked on . . . . . . . . . . . . . 14

      ii.   The divestment of the pipeline and the concurrent elimination of all
position completely eliminates any back pay period of damages . . . . . . . . . . . 15

C.    Tratree Has Incurred No Costs Associated With Replacing Lost Insurance Benefits
and Is Therefore Precluded by Law From Recovering Damages for Them . . . . . . . . . . 18

Request for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION'

BILLY RAY TRATREE,                        §
    Plaintiff,                            §
                                          §
v.                                        §          CIVIL ACTION NO. H-03-0954
                                          §
BP PIPELINES (NORTH AMERICA) INC.,        §
    Defendant.                            §

**DEFENDANT BP PIPELINES (NORTH AMERICA) INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON
PLAINTIFF'S DAMAGES**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Pursuant to Federal Rule of Civil Procedure 56, Defendant BP Pipelines (North America) Inc.

("BP") files this motion for partial summary judgment against Plaintiff, Billy Ray Tratree,

("Tratree") as to BP's liability for damages from September 27, 2001 to the present, and would

respectfully show the court the following:

**I.
INTRODUCTION**

Billy Ray Tratree ("Tratree") has been unemployed since September 27, 2001, when he

refused an unconditional offer of continued employment with BP.  He has been unemployed for

almost eight years.  Every time Tratree has filed a tax return since 2001, he has claimed zero wage

or salary income.  He is not disabled or unskilled.  To the contrary, he is a skilled pipeline employee

qualified to work in the energy industry during the largest period of growth ever experienced by the

energy industry.  The evidence indicates Tratree simply believes he should never have to work again,

and that BP is obligated to pay his pre-termination salary and benefits into perpetuity—regardless

of his legally imposed duty to mitigate his damages.

-1-

On September 18, 2001, Tratree elected not to exercise his bumping options when his position at BP was eliminated.[1] He claims that because the bump option jobs were not close enough to his home in Mexia, Texas, and since he did not want to leave Mexia, he did not have to accept the jobs. Consequently, BP terminated Tratree as required by its Collective Bargaining Agreement ("CBA") with Tratree's Union. If Tratree accepted BP's offer of continued employment, he would have no claim for back pay or front pay; his wages would have never lapsed or been cut off; his employment benefits would have continued; and he would have been eligible for retiree medical benefits. Nevertheless, Tratree refused BP's offer, leaving BP with no choice but to terminate him. This was Tratree's first failure to mitigate his damages.

Instead of behaving rationally, Tratree went home to Mexia and has not been gainfully employed these past eight years. He claims to have searched for a job, but the evidence of such a search is scant and conflicting. Tratree's alleged mitigation evidence is in the form of Texas Workforce Commission logs ("TWC logs")—required by the State of Texas to receive unemployment. His TWC logs indicate that from 2001 - 2003 he verbally inquired with the same employers who repeatedly told him that he need not formally apply because they did not have work for him. He claims that such repeated verbal inquires with employers who are clearly not hiring satisfies his duty to mitigate. Indeed, 99% of his TWC logs indicate that Tratree never so much as submitted a resume or application. Just as importantly, Tratree has testified that he has not inquired for any position with any of the at least 12 energy companies operating around Mexia.

---

[1] "Bumping" is the bargained for process whereby a BP employee whose position has been eliminated can elect to bump a less senior, less qualified BP employee from his or her job—thus the employee whose job was eliminated does not get terminated.

After 2003, there is zero documentary evidence of any job search by Tratree. To counteract the lack of documentary evidence, Tratree swears to have accepted "demeaning" employment since his termination, but in 2002, 2003, 2004, 2005, 2006, and 2007, Tratree has claimed <u>no wage or income</u> on his Income Tax Returns. (Ex. 13, Tratree's Income Tax Returns). Because of the conflict in evidence, it is not clear where the truth lies.

Meanwhile, in May 2005, the undisputed evidence shows that BP eliminated all work and positions on the pipeline where Tratree previously worked. In fact, BP sold the pipeline where Tratree previously worked to a company called Teppco Crude Pipeline, Inc ("Teppco"). As of the closing of that sale, all BP positions on the pipeline were eliminated. If Tratree's position would have been retained as he vehemently argues it should have, Tratree's position would have been undisputedly eliminated in May 2005. As a matter of law, therefore, BP is not liable for damages to Tratree after May 2005.

Finally, because the undisputed evidence proves Tratree has not incurred any costs in procuring replacement insurance benefits, BP is entitled to summary judgment as a matter of law on Tratree's claim for reimbursement of insurance benefits.

Tratree's alleged job search has been ongoing for more than 2,705 days. In more than 2,705 days, Tratree's "diligent" job search has not resulted in one single, solitary penny of taxable income. BP now moves for summary judgment on its affirmative defense that Tratree has failed to mitigate his damages, and that his back pay and front pay damages are cut-off after May 2005.

## II.
## SUMMARY JUDGMENT EVIDENCE

BP presents the Court with the following summary judgment evidence, and incorporates it

herein:

| | |
|---|---|
| Exhibit 1: | Depositions of Plaintiff, Billy Ray Tratree |
| Exhibit 2: | Deposition of Kelly Gleason |
| Exhibit 3: | Deposition of Thad Toomer |
| Exhibit 4: | Letter to Tratree, dated 9-18-01, with his bumping options |
| Exhibit 5: | Transcript of Tape Recorded Conversation between Mr. Tratree and Mr. Torres |
| Exhibit 6: | Termination letter dated 9-27-01 |
| Exhibit 7: | Deposition of Andre Parker |
| Exhibit 8: | Court's Memorandum Opinion, 11-27-06 (Docket No. 131) |
| Exhibit 9: | Trial Testimony of Billy Ray Tratree |
| Exhibit 10: | Amoco / ALF-CIO Local 4-100 Collective Bargaining Agreement ("CBA") |
| Exhibit 11: | Deposition of Bill White |
| Exhibit 12: | Trial Transcript, 10-26-06, Volume 4 |
| Exhibit 13: | Tratree's Income Tax Returns 2002 - 2007 |

## III.
## UNDISPUTED FACTS

Tratree was notified by BP on September 18, 2001 that his position was being eliminated due

to organizational changes within the company.  BP exercised its business judgment and decided that

the part of the pipeline system Tratree worked on would be shut down because of disproportionately

high operating costs.  (Ex. 2, Gleason Depo., p. 88 - 89).  Pursuant to the CBA in place between

-4-

Tratree's Union and BP, Tratree was immediately presented with his bump sheet which constituted several offers of substantially comparable employment at some of BP's other facilities. (Ex. 4, Bumping Letter and Guidelines). Acceptance of one of the positions listed on the bump sheet would have allowed Tratree to continue his employment within the company with no cessation of pay or benefits, and, Tratree would have been eligible for retiree medical benefits.

Despite the numerous attempts of Tratree's co-workers to get Tratree to sign his bump sheet, Tratree ultimately refused.[2] In fact, this Court has previously recognized Tratree's unreasonable decision to decline his bumping options "despite attempts by Tratree's supervisors, co-workers, and union brothers to convince him to sign his bumping options, Tratree refused." (Ex. 8, Court's Opinion, p. 2). As a result of Tratree's adamant refusal to sign his bump sheet, BP had no choice but to terminate Tratree's employment on September 27, 2001. (Ex. 6, Termination Letter).

Notwithstanding any allegations of discriminatory treatment by BP towards Tratree, BP sold the pipeline on which Tratree worked in May 2005. (Ex. 7, Parker 2008 Depo., p. 46 - 48). Although BP had made the decision to divest the pipeline in 2001, the decommissioning of the line took some time after the decision to sell was made because it had to be freed of hydrocarbons, packed with nitrogen, cleaned, and taken out of service. (Ex. 2, Gleason Depo, p. 88 - 89). During the interim period, because of Tratree's conscious decision not bump into another position with BP, Tratree remained unemployed from 2001 until the sale in 2005, and remains unemployed to this date. Furthermore, throughout his unemployment, Tratree has incurred no costs whatsoever for replacing lost insurance fringe benefits. (Ex. 9, Tratree Trial Testimony, pgs. 202, 204).

---

[2] Tratree was urged by (1) Thad Toomer, BP Human Resources Consultant; (2) Kelly Gleason, Tratree's district manager; and (3) Frank Torres, the Union Steward to submit his bumping options. (Ex. 3, Toomer Depo, p. 108 - 09, Ex. 1, Tratree Depos I: p. 129); (Ex. 2, Gleason Depo, p. 146);(Ex. 5, Transcript of Torres/Tratree Conversation, p. 4 - 9).

## IV.
## SUMMARY JUDGMENT STANDARD

**A.      Summary Judgment Standard of Proof.**

Where a case presents no genuine issue of material fact, summary judgment is proper. FED. R. CIV. P. 56(c); *Celotex Corp v. Catrett*, 477 U.S. 317, 322–23 (1986).  A defendant who seeks summary judgment on a plaintiff's claim must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary-judgment evidence that negates the existence of a material element of the plaintiff's claim or (2) showing that there is no evidence to support an essential element of the plaintiff's claim.  *Celotex Corp.*, 477 U.S. at 322–23.

**B.      Failure to Accept Offer of Reinstatement Standard of Proof.**

An employer in a discrimination case owes no back pay damages as a matter of law when an employee rejects an unconditional job offer from the employer. *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 241 (1982).  A claimant's refusal of "an offer of reinstatement *not* conditioned on compromising the discrimination claim" breaches his statutory obligation to mitigate damages. *Figgs v. Quick Fill Corp.*, 766 F.2d 901, 903 (5th Cir. 1985).  If the defendant establishes "it made an unconditional offer for a substantially similar position," the burden then shifts to the plaintiff to present evidence that the refusal of the job offer was reasonable. *Mahoney v. Ernst & Young, L.L.P.*, 487 F. Supp. 2d 780, 785–86 (S.D. Tex. 2006).  Therefore, if BP can establish that Tratree refused an offer of substantially comparable employment, it is entitled to summary judgment declaring that BP owes no back pay damages after the offer of employment was refused.

**C.      Elimination of Claimant's Position Standard of Proof.**

Additionally, any award of back pay is to be reduced upon a showing by the defendant that claimant's position would have been eliminated notwithstanding any alleged acts of discrimination.

*Martinez v. El Paso County,* 710 F.2d 1102, 1106 (5th Cir. 1983). The well accepted rule is that any award of back pay "should then be computed from the date of actual discharge to the date the employees would have been discharged in the absence of [discrimination]." *Mastell Trailer Corp. v. N.L.R.B.,* 682 F.2d 753, 756 (8th Cir. 1982). Therefore, if BP can establish that Tratree's position would have been eliminated despite any alleged discrimination, it is entitled to an award of summary judgment as a matter of law declaring that BP owes no back pay damages after the date Tratree's position would have been eliminated.

**V.**
**ARGUMENT AND AUTHORITIES**

**A.    Tratree Has Suffered No Damages Since September 27, 2001, When He Refused BP's Unconditional Offer of Continuing Employment.**

The overarching policy goals supporting both ADEA and Title VII remedies is the goal of making a discriminated plaintiff whole. Ideally, this purpose is achieved by reinstating the plaintiff to his former position. *Brunnemann v. Terra Int'l Inc.,* 975 F.2d 175, 180 (5th Cir. 1992) (ADEA); *Mota v. The Univ. of Tex. Houston Health Sci. Ctr.,* 361 F.3d 512, 525 (5th Cir. 2001) (Title VII). Accordingly, the United States Supreme Court has recognized that tolling back pay damages after an unconditional job offer is made encourages "defendants promptly to make curative, unconditional job offers" because such offers bring defendants into voluntary compliance and end discrimination far more quickly than utilization of formal legal processes. *Ford Motor Co.,* 458 U.S. at 228. Thus, the Supreme Court held that "absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential back pay liability." *Id.* at 241.

Tratree was presented with an unconditional offer of employment from BP through his bumping options. Consistent with his trade, these options represented substantially similar

employment and were offered unconditionally.  Tratree's refusal to accept a position on the bump

sheet was unreasonable and ends the accrual of potential back pay liability under *Ford Motor Co.*

When a defendant establishes that it has made an unconditional offer for a substantially similar

position, the burden is shifted to the plaintiff who must present evidence showing that refusal of the

offer was reasonable.  *Mahoney,* 487 F. Supp. 2d at 785–786.

i.      **BP's offer of continued employment was substantially similar to**<br>**his former position.**

Tratree was presented with several offers of employment with BP when he received notice

that his position had been terminated.  These positions afforded Tratree substantially equivalent

promotional opportunities, compensation, and job responsibilities to his prior position at BP.

Because Tratree refused these positions, he is not entitled to back pay or front pay damages as a

matter of law.

On September 18, 2001, Tratree was presented with a termination notice and a list detailing

available employment positions that Tratree could have accepted.  (Ex. 4: Bumping Letter and

Guidelines).  According to the Bumping Seniority List, Tratree was classified as a "Measurement

Specialist 1," earing $24.87/hour, working out of North Zulch at the time his position was

eliminated.  While Tratree resides in Mexia, Texas, he testified that he often drove over 85 miles

each way to North Zulch.  (Ex: 9. Tratree Trial Testimony, p. 144).

Tratree was presented with several employment options, including a position as a

Measurement Specialist 1, Tratree's classification, earning $24.87/hour, Tratree's wage.  This job

afforded Tratree with the same benefits, the same seniority rights, the same wage, and the same job

duties as his prior position—the only difference was location.  The pipeline field that Tratree had

-8-

placed himself in—the field in which Tratree had all of his work experience in—mandates long distance moves, which are fully paid for by BP.

Tratree's own testimony provides undisputable evidence that pipeline workers move to where pipelines are located if they want to continue working in the pipeline field. For example, before Tratree worked in Mexia, he testified that he worked seven years in Levelland, Texas. (Ex. 1, Plaintiff's Depos I: p. 14). It is approximately 460 miles from Levelland to Mexia. Tratree also testified that he previously worked seven years in Snyder, Texas. (*Id.*). It is approximately 343 miles from Snyder to Mexia. Finally, Tratree testified that he worked approximately seven years in Mexia, Texas. (*Id.*). Tratree's own testimony and previous relocations are undisputed evidence that substantially similar pipeline employment requires looking, and sometimes moving, almost 500 miles away.

The undisputed fact that a pipeline worker must often relocate to find substantially similar employment is also evident in Bill White—a fellow Mexia pipeline employee of Tratree—who also testified about the relocation requirements of a pipeline job. White testified that he started working in Longview, Texas, but then he had to move to Houston, Texas to continue his employment. (Ex. 11, White Depo., p. 31 - 34). Next he moved to Mexia, Texas. (*Id.*). Then he moved back to Longview, Texas. (*Id.*). Then he moved back to Mexia, Texas. (*Id.*). Finally, because the Mexia pipeline was being closed, his job moved to Teague so that he could reach 50 years of age and fully vest in his BP retirement. (*Id.*).

Further, Grayson Williams ("Williams")—the younger, white BP employee who Tratree alleges was favored over Tratree—also lived in Mexia. While Williams' position was not eliminated the same day as Tratree's, eventually the pipeline where Williams, White, and Tratree worked was

divested. After the pipeline was divested, Williams wanted to continue his pipeline employment with BP, so he took a job in Houma, Louisiana. (Ex. 7, Parker 2008 Depo., p. 61 - 63). Houma is approximately 483 miles from Mexia, Texas.

The point is clear: pipeline employees sometimes have to move to keep a substantially similar job. Moving is part of being a pipeline employee. Even more clear, Bill White testified that he would have moved again to ensure that he fully vested in his retirement. (Ex.11, White Depo., p. 53, line 11 - 17). Therefore, location alone, when viewed in light of the industry norm cannot render Tratree's bump options dissimilar under *Ford Motor Co.* Accordingly, because Tratree refused a position that was substantially similar, he is not entitled to back pay damages as a matter of law.

ii.      **Tratree ignored several provisions of the Collective Bargaining Agreement that were designed to effectively and efficiently provide for a substantially similar employment position.**

In his trial testimony, Tratree contradicts himself with regards to his knowledge of the mechanics of the bumping process. As an initial matter, BP directs the Court to Tratree's statement that "I knew the contract. I used to be a union steward. I knew the contract." (Ex. 9, Tratree Trial Testimony, p. 169). Tratree adamantly made this assertion with regards to the inaccuracies of his bumping options. At the same time, Tratree, a man who "knew the contract" testified that "every time you get a bump sheet it's five days and, if there's something wrong and they send you another bump sheet, it's another five days because it deletes the first one." (*Id.* at 178). While Tratree's selective interpretation of the CBA provides beneficial support to his argument, it ignores the clear text of the CBA. *See Wade v. Southern Pac. Co.,* 248 F. Supp. 493 (S.D. Tex. 1965) (recognizing that seniority rights arise by reason of contract).

-10-

The CBA between Amoco/BP and the Oil, Chemical and Atomic Workers Intentional Union AFL-CIO Local 4-100 ("Tratree's Union") clearly specifies the details of the bumping process. Specifically, under Article 10, "Demotions and Bumping," the CBA clearly states that "employees ... must make selection within five (5) working days from time of notification or their employment will be discontinued." (Ex. 10, CBA, 14). Thus, Tratree had five working days from the time of "notification," which was made on September 18, 2001, to make his selection. BP even afforded Tratree additional time above and beyond the five days—Tratree was not terminated until September 27, seven business days later. The text of the CBA does not provide support that the five day window would be reset. Additionally, Tratree's termination letter and bump options specifically stated "in the event you do not receive the information in time to allow you to meet this time frame, please let me [Thad Toomer] know." (Ex. 4, Bumping Letter and Guidelines). Tratree however did not complain about the five day window and instead adamantly insisted that he would not sign the bump sheet because, in his opinion, it was incorrect. However, Tratree's conscious decision to do this was in violation of yet another provision of the CBA, the grievance procedures.

Specifically, Article 34 of the CBA, "Grievance Procedure" directs "any employee who feels that he/she has not been accorded proper consideration or treatment in respect to any matter affecting his/her employment shall proceed" with the grievance procedure. (Ex. 10, CBA, 53). Indeed, this is the exact process that was urged upon Tratree by his supervisors, co-workers, and union brothers. Tratree understood that if he had any questions about his options, he could call Toomer or Doris Weems, an administrative assistant. (Ex. 4, Bumping Letter and Guidelines; Ex. 1, Plaintiff's Depos. I: p. 127). There is no evidence that Tratree ever tried to reach anyone at BP prior to his September 25, 2001 bumping deadline. Rather, when Toomer and Weems realized that Tratree's

September 25th bumping deadline was approaching and they had not received anything from him, they called Tratree. (Ex. 3, Toomer Depo., p 108 - 09; Ex. 1, Plaintiff's Depos. I: p. 129). Weems asked Tratree, "Where is your Election of Bumping Option Form?" (Ex. 1, Plaintiff's Depos. I: p. 129). Tratree claims that he told Weems that there was an error on his bumping sheet, and that he had no intention of signing it. (Ex. 1, Plaintiff's Depos. I: p. 136).[3]   Kelly Gleason—Tratree's district manager—also called Tratree and left a message with Mrs. Tratree asking Tratree to return the call (Ex. 2, Gleason Depo., p. 146), as did Toomer. (Ex. 3, Toomer Depo., p 108 - 09) ("[I] started trying to contact him two or three times a day."). Additionally, Toomer called Frank Torres, the Union steward, and asked him why Tratree had not signed his bump sheet. (*Id.*) Toomer and Torres were in contact with each other for several days, and both were unsuccessful in getting Tratree to return their calls. (*Id.*) As the Court noted in 2006, "Despite attempts by Tratree's supervisors, co-workers and union brothers to convince him to sign his bumping options, Tratree refused." (Ex. 8, Court's Opinion, p. 2).

Tratree chose to ignore several provisions of Tratree's Union's CBA with BP, an agreement which he testified he was familiar with. Not only did Tratree decline an offer of continuing employment, but he ignored the formal dispute resolution mechanism that was in place to address any concerns that he had with the process. Had Tratree invoked the grievance process, as urged by his co-workers and supervisors, and which he must have been aware of as a former union steward,

---

[3] Mr. Toomer denied that Tratree ever informed anyone about an alleged error on the bump sheet. (Ex. 3, Toomer Depo., p. 121 - 22).

Even if the bump sheets were erroneous, the proper procedure is to file a grievance. Tratree understood that if he felt there was something wrong with his bump sheet, he had the right to grieve. (Ex. 1, Plaintiff's Depos. II: p. 283). He unilaterally, and erroneously believed that if he signed the bump sheet, "it would be binding.. . . [t]hey could have shipped me off to New Mexico or wherever they wanted to do." (*Id.* at 284). In response to this allegation, Gleason explained, "[P]eople did not just get their bumping options, finish it, and were mandated the next day to pack up and go." (Ex. 2, Gleason Depo, p. 225).

Tratree could have efficiently and quickly resolved any possible disputes surrounding his bumping guidelines. This is consistent with the well settled principle that seniority rights are contract based—Tratree should have disputed the options provided to him using the contractually agreed dispute resolution mechanism. Instead, Tratree chose to embark down a slow and drawn out litigation process. Tratree's outright disposal of the CBA provisions is not a decision for which BP is liable.

Simultaneous to receiving notice that his position was being eliminated, Tratree received an offer of substantially comparable employment which he refused. Not only did he not accept the offer, but he outright ignored the terms of the CBA, which could have efficiently and effectively resolved this matter years ago. Instead, Tratree chose to cease work and now seeks damages for the past 7 years of his unemployment. Because Tratree chose to disregard and refuse BP's offer of employment, BP is not liable for back pay damages. Therefore, BP is entitled to summary judgment, finding that Tratree has sustained no damages as a matter of law since September 27, 2001 when he unreasonably refused an unconditional offer of employment from BP.

**B.      Tratree Has Suffered No Damages Since May 2005, When BP Fully Divested the Pipeline that Tratree Worked On, Eliminating All Positions.**

Alternatively, even if BP is not entitled to summary judgment on Tratree's claim for damages since 2001—the date that Tratree failed to exercise his bumping options—BP is certainly entitled to summary judgment on Tratree's claim for damages after May 2005—the date that BP fully divested the section of pipeline that Tratree worked on. It is well accepted in the Fifth Circuit that an employer's liability for back pay damages ceases on the date that the claimant's position would have been undisputedly eliminated. *Welch v. University of Texas,* 659 F.2d 531, 535 (5th Cir. 1981). BP fully divested the pipeline that Tratree worked on in May 2005, selling off all assets to Teppco.

-13-

Because Tratree's position with BP would have undisputedly been eliminated at that point and

Tratree was unwilling to move from Mexia, BP is entitled to summary judgment as a matter of law

declaring that Tratree has no back pay damages from May 2005 until the present.

> **i.    BP's determination to eliminate Tratree was the result of sound business judgment to ultimately divest the pipeline Tratree worked on.**

BP's letter to Tratree, informing him that his position had been eliminated, explained that

the elimination was due to "continuing organization changes in the operation of BP Pipelines North

America." (Ex. 4, Bumping Letter and Guidelines).

The portion of the pipeline that Tratree worked on had been slated for shut-down well prior

to Tratree's termination.  Kelly Gleason, the district manager for the Southern Offshore area,

explained that:

> this discussion on shutting this line down and eliminating these assets have been
> going on for years.  The prior district managers had wanted to shut it down but were
> reluctant to because they wanted it while they were taking care of repairs on the south
> end of the line because they had an opportunity to go north with trucked-in-crude that
> they would not have had had [sic] they shut the line down.

(Ex. 2, Gleason Depo., p. 155).  This decision was not just within the knowledge of the pipeline

managers, but Toomer, a Human Resources Consultant for BP, testified that "it was fairly common

knowledge that Mr. Gleason was considering shutting down a certain section of the pipeline." (Ex.

3, Toomer Depo., p. 103).  Indeed, this portion of the pipeline was targeted by several BP managers

for divestment "because of the low throughput relative to the operating cost on it." (Ex. 2, Gleason

Depo., p. 88-89).  However, BP's decision to divest this portion of the pipeline was not just

financially motivated:

> There was more than just economics tied to that system.  There was concern about
> environmental operations around that line.  It's one of the oldest lines that Amoco

-14-

owned at the time. Sections of that system had been laid sometime, I believe, in the late '30s. It was not anything that we wanted to retain for long-term operatorship based on the type of construction it was under. Under today's guidelines, it would be something that would have been certainly pushed to be decommissioned and taken out versus the type of inspection tools that need to be run on it and repairs.

(*Id.* at 213 - 14).

This portion of pipeline was shut down in 2001—BP "wasn't moving oil through it." (Ex. 7, Parker 2008 Depo., p. 47). However, due to DOT compliance requirements, BP was required to "have some people doing . . . surveillance on the line," "even if the line is idle." (Ex. 2, Gleason Depo., p. 93). In the meantime, the line had to be closed all the way down and decommissioned by "hydrocarbon freeing it, packing it in nitrogen, cleaning the station oil, piping it up at Mexia, and essentially taking that line out of service." (*Id.* at 92). The pipeline was fully divested, and the assets sold off to Teppco in May 2005. (Ex. 7, Parker 2008 Depo., p. 47 - 48). All remaining positions were eliminated at that time in 2005, including Grayson Williams' position, who now works off-shore and is based out of Louisiana. (*Id.* at 62).

<blockquote>
ii.    <strong>The divestment of the pipeline and the concurrent elimination of all position completely eliminates any back pay period of damages.</strong>
</blockquote>

Along with most federal circuits, the Fifth Circuit recognizes the principle that awards of back pay terminate if the former employer establishes that the plaintiff's position would have been eliminated notwithstanding the alleged discrimination. *Martinez v. El Paso County,* 710 F.2d 1102, 1106 (5th Cir. 1983) (holding that plaintiffs back pay award is to be reduced because his position would have been eliminated). Under this rationale, the Fifth Circuit upheld a trial court's decision to eliminate any back pay award after the date that a grant, under which the discriminatee was employed, was eliminated. *Welch,* 659 F.2d at 535. The Fifth Circuit reasoned that "it is simply a

matter of speculation whether [the plaintiff] would have been shifted to another grant after [that date]." *Id.*

Thus, the proposition that "the calculation period for back pay terminates if the former employer establishes that the plaintiff's position would have been eliminated at some point during the alleged entitlement period for business reasons or for other unrelated factors" is generally supported across the circuit courts. *Taylor v. Cent. Penn. Drug & Alcohol Servs. Corp.*, 890 F. Supp. 360, 371 (M.D. Pa. 1995); *see also Bhaya v. Westinghouse Elec. Corp.*, 700 F. Supp. 600, 605 (E.D. Pa. 1989) (holding that back pay terminates when the plaintiff's former job would have been eliminated due to other factors); *EEOC v. Regency Architectural Metals Corp.*, 896 F. Supp. 260, 271 (D. Conn. 1995) (holding that the cut off point for recovering back pay is when the shop where the Plaintiff was working went out of business); *Bartek v. Urban Redevelopment Auth. of Pittsburgh*, 882 F.2d 739, 747 (3d. Cir. 1989) (holding that back pay is cut off because the plaintiff's position was eliminated); *Miano v. AC & R Advertising, Inc.*, 875 F. Supp 204, 222 (S.D. N.Y. 1995) (holding a Plaintiff is not entitled to be put in a better position that they would have been in without alleged discrimination by providing back pay if a position would have been eliminated); *EEOC v. Monarch Machine Tool Co.*, 737 F.2d 1444, 1453 (6th Cir. 1980) (holding that where the employer sells the business and terminates all employees, plaintiff's right to back pay ends upon the date of sale). [4] The legal support for this proposition is both overwhelming and irrefutable by the Plaintiff, and must be applied to the facts of this present matter.

---

[4] *See also, Grame v. Osborn Transp., Inc.*, 2001 WL 951357, at *2 (D. Kan. 2001) (same); *Mastrell Trailer Corp v. N.L.R.B.*, 682 F.2d 753, 756 (8th Cir. 1982) (same); *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1111, n. 4 (8th Cir. 1994) (same); *Rhoads v. F.D.I.C.*, 2002 WL 31755427, at * 2 n. 2 (D. Md. 2002) (same).

There is no <u>speculation</u> as to whether Tratree's position would have been eliminated notwithstanding any alleged discrimination. BP fully divested its operations at the Mexia/North Zulch facility in May 2005 when it sold the pipeline to Teppco. (Ex. 7, Parker 2008 Depo., p. 47 - 48). In May 2005, Tratree's position and employment with the company would have been undisputably eliminated, forcing him to seek employment outside of Mexia. If Tratree was still employed with BP at the time this pipeline segment was sold, he would have been presented with a termination letter and bumping options per the CBA similar to those that were presented to him in 2001, with no jobs in Mexia. Accordingly, because Tratree's position would have been undisputedly eliminated in May of 2005 and Tratree did not want to move, BP's duty to provide back pay benefits ceases at that point.

Furthermore, as discussed, *supra*, Grayson Williams, the younger, white BP employee who Tratree alleges to have been favored at Tratree's expense also lost his position in Mexia at the time this portion of the pipeline was divested. (Ex. 7, Parker 2008 Depo., p. 61 - 63). There is absolutely no proof that Tratree could have remained employed by BP in Mexia, regardless of any alleged discrimination

Therefore, as a matter of law, Tratree is not entitled to damages after May 2005, the date when his position would have undisputedly been eliminated due to the sale of the pipeline. Because the pipeline divestment date cuts off any back pay damages for Tratree, BP's Motion for Partial Summary Judgment as to damages after May 2005 should be granted.

-17-

**C.  Tratree Has Incurred No Costs Associated With Replacing Lost Insurance Benefits and Is Therefore Precluded by Law From Recovering Damages for Them.**

Among other things, Tratree seeks to recover damages for lost insurance benefits that he received while employed by BP. However, since his termination in September, 2001, Tratree has incurred no expenses with respect to procuring insurance coverage and therefore is precluded as a matter of law from recovering compensatory damages under the ambit of fringe benefits.[5]

The general rule is that "a plaintiff suing under the ADEA and Title VII may recover damages for pecuniary losses of fringe benefits." *Rhodes v. Guiberson Oil Tools,* 82 F.3d 615, 623 (5th Cir. 1996)(ADEA) (citing *Brunnemann,* 975 F.2d at 178; *Pettway v. Am. Cast Iron Pipe Co.,* 494 F.2d 211, 263 (5th Cir. 1974) (Title VII)). However, Fifth Circuit law dictates that "the factfinder may not award damages for losses not supported by the evidence." *Rhodes,* 82 F.3d at 623. (citing *Brunnemann,* 975 F.2d at 178). In other words, the plaintiff must have evidence that replacement expenses were actually incurred. *Id.* For example, in *Brunnemann,* the plaintiff sought recovery of dental insurance premiums and the face value of a life insurance and accidental death policy. *Brunnemann,* 975 F.2d at 180. The Fifth Circuit Court of Appeals held that because the plaintiff failed to provide evidence that he actually incurred costs in replacing these benefits, he was not entitled to recover any damages for the lost benefits. *Id.*

Similarly, Tratree is foreclosed from recovering the value of lost benefits because, not only has he not provided any evidence of expenses actually incurred, he has affirmatively admitted that he has not procured insurance coverage since termination. When Tratree was asked at trial whether

---

[5] In fact, this exact issue was raised at trial on the objection of defendant's counsel who urged that "[Dr. Steward] does not get to testify abut the lost fringe benefits because there are no out-of-pocket expenses incurred." (Ex. 12, Trial Transcript,10-26-06, Vol. 4., p. 583-84). After a review of the applicable case law, counsel for Plaintiff conceded that "the authority [defense] cited on the fringe benefits is correct." (*Id.* at 585).

he incurred any expenses in procuring lost insurance benefits after his employment was terminated

he responded that he had not:

| | |
|---|---|
| Counsel: | Mr. Tratree, did you purchase any type of insurance after you left BP? |
| Tratree: | Not that I can think of. |
| Counsel: | Okay.  Did you get any type of insurance whatsoever? |
| Tratree: | No I didn't. |

                    * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| Counsel: | So, you haven't incurred any out-of-pocket expenses, then, in getting insurance because you didn't get any? |
| Tratree: | That's correct |

(Ex. 9, Tratree Trial Testimony, pgs. 202, 204).  A similar exchange occurred at Tratree's deposition

on November 18, 2008:

| | |
|---|---|
| Counsel: | And your answer is that you're seeking recovery for medical expenses, but you haven't determined the amount and you will supplement the answer.  Can you shed any light on that as we're sitting here today in your deposition? |
| Tratree: | No ma'am. |
| Counsel: | Have you incurred medical expenses since October, 2006? |
| Tratree: | I can't recall if I have. |

                    * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| Counsel: | And then Interrogatory No. 6 asks if you are - - have any type of plan of insurance.  And in September 2008 your answer was no.  Is that still your answer in November 2008? |

                    * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| Tratree: | The answer is still no. |

-19-

(Ex.1, Plaintiff's Depos., IV, pgs. 54 -55).  Therefore, Tratree cannot now complain that he has

suffered harm as a result of losing BP's insurance benefits because he has not incurred any expense

in replacing the lost fringe benefit.

Such a finding is consistent with the make-whole purpose behind both Title VII and the

ADEA.  *See Reneau v. Wayne Griffin & Sons, Inc.,* 945 F.2d 869, 870 (5th Cir. 1991) (recognizing

that the purpose behind the ADEA is to make the victim of age discrimination whole); *Gloria v.*

*Valley Grain Products, Inc.,* 72 F.3d 497, 499 (5th Cir. 1996) (recognizing that the purpose of Title

VII remedies is to make plaintiffs who suffered adverse employment actions due to discrimination

whole).  Consistent with this objective, neither Title VII nor ADEA remedies should be crafted to

place the plaintiff in a better position than he would have been in had the discriminatory acts not

occurred.  *Tyler v. Union Oil of Cal.,* 304 F.3d 379, 401 (5th Cir. 2002) (ADEA); *Gloria,* 72 F.3d

at 499 (Title VII).  In this case, awarding Tratree damages for lost insurance benefits would produce

a windfall to Tratree because he would be compensated for benefits when he incurred no loss or

costs.  Thus, Tratree would be in a better position than he would have been in had the alleged

discriminatory actions not taken place—a position that is disharmonious to the intentions of both

Title VII and the ADEA.

Based on the Fifth Circuit law and the ultimate purpose and goal of both the ADEA and Title

VII, Tratree is not entitled to damages for lost insurance benefits as a matter of law because he has

not incurred any expense in replacing these benefits.  Therefore, BP's motion for partial summary

judgment as to damages should be granted as to any claims for lost fringe insurance benefits.

**Request for Relief**

For these reasons, Defendant BP Pipelines (North America) Inc. requests that the Court grant this Motion for Partial Summary Judgment in favor of BP, finding that BP owes Tratree no damages since September 27, 2001, or for loss of insurance benefits. Alternatively, BP requests this court grant partial summary judgment in favor of BP, finding BP owes no damages since May 2005, or for loss of insurance benefits. BP further requests all other relief to which it may be justly entitled.

Respectfully submitted,

Monica F. Oathout (SBN 07088320)
Steven R. Rech (SBN 16649200)
Kanaan L. Wilhite (SBN 24060830)
Schwartz, Junell, Greenberg & Oathout, L.L.P.
909 Fannin Street, Suite 2700
Houston, Texas 77010
Tel: (713) 752-0017
Fax: (713) 752-0327

**Attorneys for Defendant,
BP Pipelines (North America) Inc.**

OF COUNSEL:

Neil L. Brilliant
BP Legal
BP America Inc.
4101 Winfield Road
Mail Code 4 West
Warrenville IL 60555
Tel:  (630) 821-2310
Fax:  (630) 821-3402

-21-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument, *BP Pipelines (North America) Inc.'s Motion for Partial Summary Judgment on Plaintiff's Damages*, has been served upon:

> Carlos R. Soltero
> McGinnis, Lochridge & Kilgore, L.L.P.
> 600 Congress Avenue, Suite 2100
> Austin, Texas 78701

> David W. Scott
> 406 W. Keenland Drive
> Georgetown, Texas 78626

via electronic delivery and/or first class mail this 13th day of March, 2009.

Monica F. Oathout

-22-